## THE TOWN OF CONCORD *vs.* THE TOWN OF GOFFSTOWN.

When a marriage takes place between a female pauper of one town and a male pauper of another town, the settlement of the female is changed to the latter town, if the paupers entered into the marriage contract without force, fraud, bribery, or any undue influence on the part of the former town.

After the contract is made, the banns published, and the female has charged the male pauper with being father of an illegitimate child, of which she is pregnant, it is not a fraud or any other offence for the selectmen of the town in which the female is settled to advise concerning the solemnization of the contract and to go for a minister to perform the ceremony.

Semb. that if the selectmen had procured the contract of marriage and with an intent to change the settlement of the female, the settlement would thereby have become changed, although the selectmen themselves might be liable to an indictment.

THIS was assumpsit for relief furnished to one *Susan Johonnott,* between the 1st of August and the 4th of December, A. D. 1818.

At the trial here, September term, A. D. 1819, the only question was concerning the settlement of said *Susan.*

On the part of the plaintiffs, it was proved, that the pauper, March 26th, 1812, married *William Johonnott,* who was then settled in Goffstown, and has since died without obtaining any different settlement.

On the contrary, the defendants proved that before the marriage of said *Susan,* her settlement was in Concord ; that both she and said *William* were then poor ; that he was a black and infirm in health ; that she was not then supported at the expense of Concord, but had at a former period received some relief as a pauper ; that said *Susan* and *William* became acquainted with each other, and early as September, A.D. 1811, caused their intention of marriage

Concord
*vs.*
Goffstown.

to be published by the town clerk of Concord ; that the celebration of it being deferred, and in March 1812, she being pregnant, and having charged said *William* as the father of the child, the selectmen of Concord sent to Goffstown for said *William* to give indemnity for the support of the child ; that said *William* accordingly came to Concord, and proposed to fulfil his promise of marriage ; that one of the selectmen, without any conference with his fellows and without any instructions from the town of Concord, but as he testified, at the request of the person, in whose house said *Susan* then resided, called upon a minister to perform the marriage ceremony ; that the minister hesitated to perform it in consequence of the want of a certificate of the publication of banns in Goffstown, but something being said as to indemnifying him, though the selectman testified that he made no agreement to do it, the marriage was solemnized.

On these facts, the parties by consent, took a verdict for the defendants, subject to future consideration on the operation of said marriage in respect to the settlement of the pauper.

*S. Fletcher*, for the plaintiffs.

*Smith*, for the defendants.

(1) 1 N. H. Laws 362.

WOODBURY, J.* Our statute of January 1st. 1796,(1) provides that " a married woman shall have the settlement of " her husband, if any he have within the state."

In this case it appeared in evidence, that *William Johonnott* had a settlement in Goffstown, and, before the relief now sued for was furnished to *Susan Johonnott*, that she had been married to said *William*.

The settlement of the wife, therefore, was changed to that of her husband ; and the plaintiffs must recover, unless such circumstances accompanied the marriage as would render it void in respect to settlements.

It must be admitted, however, that the marriage was valid as between the parties ; for they had commenced an acquaintance, and published their intention of marriage some

---

* Green, J., having been of counsel, did not sit.

months before the interference of any third persons : and when one of the selectmen of Concord, afterwards interested himself in the subject, it is not pretended, that he practised any fraud on the parties to the marriage so as to vitiate the contract in respect to them. As between them, it was open, voluntary, perfect ; and neither of them afterwards appear to have expressed any dissatisfaction. If avoided, then, it must be avoided in relation to only such other persons, as may have aided to produce it from sinister motives. This can be done, too, only by construction, founded on some established principle of the common law ; because no statutory provision exists, by which a marriage, without any inherent defect, as between the parties to it, can thus be invalidated in relation to third persons.

It is, without question, an important and an established axiom, that no person shall profit by his own wrong. The argument, therefore, is, that, as this marriage was caused by the town of Concord, to injure and defraud Goffstown, concerning the support of the pauper, Concord shall not avail themselves of the benefit of that wrong, in a controversy with Goffstown.

But it deserves consideration, whether the premises are correct, that this marriage was caused by Concord, and with such views, or if it was, whether the inference, that might usually follow cases of fraud, is not here controlled by other principles of a paramount nature, growing out of the whole facts in the case.

In the *King vs. Fowler and others*, (1) it was ruled, that overseers of the poor cannot be convicted of a conspiracy to marry paupers, unless they " made use of some violence, " threat or contrivance, or used some sinister means to procure " the marriage, without the voluntary consent or inclination " of the parties themselves." " That the act of marriage, " being in itself lawful, a conspiracy to procure it could on- " ly amount to a crime, by the practice of some undue " means."

Yet here the contract of marriage, which is the essential part of marriage, was made some months before the inter-

(1) 1 East,
Cr. Law 461.

34

*Concord vs. Goffstown.*

ference of any person in behalf of Concord. So was the publication of the banns. And though *William Johonnott* was sent for by one of the selectmen, to give indemnity for the support of a child, of which he had been truly charged to be the father, this interference was proper, and the proposition to solemnize the marriage before contracted, came from *Johonnott* himself. The selectman went for the minister, by request of others ; and if afterwards he promised to indemnify the minister, which was doubtful on the evidence, the promise was not made by direction of the town, or by the advice of a majority of the selectmen ; no threat, bribery or deception was employed towards either of the parties to the marriage ; but it manifestly happened in consequence of the voluntary engagement of the parties, and the subsequent pregnancy of the female. Under such circumstances, if overseers recommend a celebration of a previous contract, and obtain an officer for that purpose, they do no more than as selectmen of the town, and as guardians of good morals, they are bound to do. In ancient complaints for bastardy, special caution was always taken to insert, that the child, when born, would be illegitimate, " unless pre- " vented by previous marriage." In England, also, though undue means be taken to effect a marriage between persons thus circumstanced, courts uniformly refuse an information against the overseers.(1)

(1) Caldecot 247, note.— 8 Mod. 321, note.

Again, in the *King vs. Tanner et al.*,(2) it is ruled, that neither an information nor indictment will lie against overseers for improperly procuring a marriage, unless the female at the time was " actually chargeable." The female in this case was not actually chargeable at the time of the marriage. But by the 35th George III. the law is now altered,(3) though, before this statute, the female being poor, pregnant and unmarried, ought perhaps to have been deemed tantamount to being " actually chargeable."–1 *East C. L.* 462.—1 *Bl. Com.* 362, *note.*

(2) 1 Es. Ca. 304.—3 Chitt. Cr. L. 1158.

(3) 2 Barn. & Ald. 151, Rex vs. Inhabitants of Idle.

However this may be, yet, on the other facts, we are inclined to think, that in point of law no indictment could be sustained against any person for what was done in respect

Concord
*vs.*
Goffstown.

to this marriage. But if an indictment would lie, it is by no means clear, that the inference, made by the defendants, is just ; viz. that the marriage is void in respect to a change of the settlement of the female ; or, in other words, is void as to the persons, whose agent produced it by an improper interference. For it cannot be thus void without impairing the rights of the innocent parties. The wife and children would remain chargeable to Concord ; the husband to Goffstown ; and thus, without any offence on their part, the marital, paternal and filial connection of these people would be severed, and those, whom the law forbids to be separated for maintenance, would be divided, and deprived of each other's society and advice.(1)

(1) 1 Bl. Com. 362.—1 Salk. 523.—Ld. Ray. 1473.— Str. 544.

If the overseers have offended, they may be punished ; but the innocent should not suffer with the guilty. This reasoning is fortified by a recurrence to authorities ; though we admit, that no precedent has been found, in which it was singly and solemnly adjudged, that the marriage continues valid, where the overseers are subject to indictment.

But in all the books of forms, the uniform allegation in the complaint is, that by the marriage the other parish has been injured, which could hardly be true, if the marriage was void as to the other parish. Thus says *Ashurst, J.,*(2) " the gravamen is the bringing a charge on the parish." Thus, in 3 *Chitty Cr. L.* 1159, the form is, that " the parish " was charged" and incurred much expense by such marriage. Thus, in the *King vs. Watson,*(3) where the overseers paid £10, and a fat hog to a soldier of another parish, to marry an idiot of their parish, it is added, " whereby she " and her child became chargeable" ; and it is remarked in *Rex vs. Compton et al.*(4) " that the parish in which the hus- " band lived were, by this criminal conduct of the other " parish, deprived of all relief on the question of settle- " ment." It is asserted, in 3 *Burns' Justice, Title, Settlement by Marriage, p.* 380, and in *Reeves' Dom. Rel.* 188, that, notwithstanding the improper conduct of the overseers, they alone are punishable, and the marriage in such case always

(2) 1 Es. Ca. 304.

(3) 1 Wils. 141.

(4) Caldecot 247, note.

Concord
vs.
Goffstown.

remains valid to every purpose. *Vid.* also, 2 *Maul. & Selw.* 503, *Rex vs. Inhab. of Kilby, arguendo.*

We have been thus minute, in consequence of the absence of adjudged cases in point; in consequence of the important principle, that persons should not be permitted to profit by their own wrong ; and in consequence of the analogy, that when an unmarried pregnant woman is by fraud removed to another parish, the child remains chargeable to her for-

(1) Auth. ante.  mer place of residence.(1)

But in the last case, no conflicting principle prevents the application of the rule, that none shall be benefitted by their own misconduct ; and on a view of the whole facts, reasonings and authorities, we are satisfied, that the verdict must be set aside, and a general one entered for the plaintiffs for the amount expended.