In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 19-3095

NICK PEARSON, et al.,

*Plaintiffs-Appellees*,

*v.*

TARGET CORP., et al.,

*Defendants-Appellees*,

*v.*

RANDY NUNEZ, et al.,

*Objectors-Appellees*,

APPEAL OF: THEODORE H. FRANK,

*Objector*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-07972 — **John Robert Blakey**, *Judge*.

———————————

ARGUED JUNE 4, 2020 — DECIDED AUGUST 6, 2020

———————————

Before ROVNER, WOOD, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. We address here a recurring problem in class-action litigation known colloquially as "objector blackmail." The scenario is familiar to class-action litigators on both offense and defense. A plaintiff class and a defendant submit a proposed settlement for approval by the district court. A few class members object to the settlement but the court approves it as fair, reasonable, and adequate under Federal Rule of Civil Procedure 23(e)(2). The objectors then file appeals. As it turns out, though, they are willing to abandon their appeals in return for sizable side payments that do not benefit the plaintiff class: a figurative "blackmail" by selfish holdouts threatening to disrupt collective action unless they are paid off. See Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623, 1624 (2009).

That's what happened here. Three objectors appealed the denial of their objections to a class action settlement and then dismissed their appeals in exchange for side payments. The last time this case was here, we called such "selfish" objector settlements "a serious problem." *Pearson v. Target Corp.*, 893 F.3d 980, 986 (7th Cir. 2018) (*Pearson II*). The question before us now is whether, on motion of another class member, the district court had the equitable power to remedy the problem by ordering the settling objectors to disgorge for the benefit of the class the proceeds of their private settlements. The district court held that it did not, finding that the objectors had not intended or committed an illegal act nor taken money out of the common fund.

We reverse. Falsely flying the class's colors, these three objectors extracted $130,000 in what economists would call rents from the litigation process simply by showing up and objecting to consummation of the settlement to slow things down

until they were paid. We hold that settling an objection that asserts the class's rights in return for a private payment to the objector is inequitable and that disgorgement is the most appropriate remedy. Objectors who settle their objections for amounts in excess of their shares as class members are, in essence, "not paid for anything they owned." *Young v. Higbee Co.*, 324 U.S. 204, 213 (1945) (reversing denial of remedy in comparable private settlement of class-based objections). The objectors' settlement proceeds here belonged in equity and good conscience (*ex aequo et bono*, according to the old formula) to the class and ought to be disgorged. We therefore reverse the district court's order denying disgorgement and remand for further proceedings.

## I.  *Factual and Procedural Background*

In November 2011 named plaintiffs filed a putative class action in federal district court in Illinois alleging that defendants had made false claims about certain dietary supplements they manufactured and distributed. In March 2013 the parties negotiated a settlement and asked the district court to approve it. Over the objection of class member Theodore Frank, the district court did so in January 2014. Frank appealed and we reversed. The settlement was plagued by "fatal weaknesses" and amounted to a "selfish deal" between class counsel and defendants that "disserve[d] the class." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (*Pearson I*), discussing in greater detail plaintiffs' claims and the terms of the disapproved "*Pearson I* settlement."

In April 2015 the parties negotiated and submitted to the district court for approval a new settlement known as "the *Pearson II* settlement." The agreement provided for a common

fund of $7.5 million and a permanent injunction against certain labeling statements. Before the district court, three class members objected to the *Pearson II* settlement: Randy Nunez, Steven Buckley, and Patrick Sweeney, who are all appellees here.

In March 2013 Nunez had filed his own putative class action against defendants in federal district court in California, two months before the *Pearson I* settlement was submitted for approval to the district court in Illinois. Nunez alleged defendants had made false claims about one of the supplements at issue in this case. Before defendants answered the complaint, *Nunez* was stayed pending the *Pearson I* settlement negotiations. After we vacated the *Pearson I* settlement, Nunez asked the district court in California to lift the stay and to name his lawyers interim counsel of the *Pearson* subclass Nunez hoped to represent. The court granted both motions.

The *Pearson* parties refused to include Nunez's counsel in their negotiation of the *Pearson II* settlement. Nunez moved to intervene in *Pearson*, pointing to his counsel's interim appointment order in *Nunez*. The district court denied intervention but invited Nunez to object to the forthcoming *Pearson II* settlement when it was presented. Nunez accepted the invitation. In a four-page submission, he argued that his counsel was the only counsel "with authority" to settle his proposed class's claims and that defendants should not be permitted to auction off the case to the cheapest class counsel (without giving any reason to believe that had actually happened with the *Pearson II* settlement).

In another four-page submission, Buckley argued that class counsel were entitled to no more than 20 percent of the

settlement fund in fees, not the 33 percent the proposed settlement promised them. According to Buckley, class counsel were impermissibly seeking to bill time spent negotiating and defending the inadequate *Pearson I* settlement, and also had more expensive partners bill too many hours as compared to less expensive associates and paralegals.

Sweeney objected pro se. In his four-page submission, he suggested implementing several measures to improve oversight of the settlement distribution process. Sweeney acknowledged this was not "the 'usual' procedure" but urged its adoption nonetheless. He also advanced miscellaneous objections relating to class counsel's fees, the notice of the proposed settlement, and defendants' failure to admit liability under the Telephone Consumer Protection Act (which defendants were never alleged to have violated).

The district court approved the *Pearson II* settlement. All three objectors appealed. All three dismissed their appeals before briefing began. The dismissals struck Frank as suspicious and possibly in bad faith. He sought to reopen the case in the district court by filing a motion for disgorgement of any payments made to objectors in exchange for dismissing their appeals. The district court denied the motion for lack of jurisdiction. Frank appealed again, precipitating our decision in *Pearson II*.

There, we described Frank's theory of the objectors' possible bad faith as follows:

> [A]n absent class member objects to a settlement
> with no intention of improving the settlement
> for the class. Instead, the objector files her objec-

tion, appeals, and pockets a side payment in ex-
change for voluntarily dismissing the appeal. A
potential benefit for the class—a better settle-
ment—is leveraged for a purely personal gain—
a side bargain.

893 F.3d at 982. We reversed, concluding that the district court
had jurisdiction to entertain Frank's motion and that Frank
should have been allowed to pursue his theory. *Id.* at 983.

On remand, discovery showed that the three objectors had
indeed all received side payments in exchange for dismissing
their appeals—$60,000 each to Nunez and Buckley and
$10,000 to Sweeney, totaling $130,000—while the class had re-
ceived nothing. The district court, however, concluded that
"the record failed to confirm suspicions of blackmail or other
wrongdoing" and so denied disgorgement. Nunez, Buckley,
and their counsel asserted that they had pursued their objec-
tions in good faith, not for the purposes of blackmail.[1] The
court could not say the same for Sweeney but found the ques-
tion ultimately "irrelevant" because there was "no basis to
conclude that the side settlements harmed the class" by taking
money that had been earmarked for it. The district court
therefore denied Frank's motion. Frank has appealed, and
Nunez and Buckley have appeared to defend their payments.

---

[1] The colloquial term "objector blackmail" can cause confusion that
distracts from the relevant equitable principles. Proof of a crime or other
statutory violation is not required. Similarly, Frank complains that he has
been unfairly branded a "professional objector." We have avoided that
pejorative phrase because the merits of an objection are relevant, not am-
ateurism or experience.

None of the original *Pearson* parties has participated in this appeal, and neither has Sweeney.

II. *Analysis*

A motion for disgorgement is addressed to the equitable discretion of the district court, and we review the court's ruling on the motion for abuse of that discretion. *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997), citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). A district court abuses its discretion by applying an incorrect legal standard or by reaching a clearly erroneous conclusion of fact. *Salgado v. General Motors Corp.*, 150 F.3d 735, 739 (7th Cir. 1998). As explained below, in finding that the money defendants paid to objectors had not been earmarked for the class, the district court failed to address a critical piece of evidence. More fundamental, though, that factual question appeared relevant only because the district legally erred by requiring some positive statutory violation as a predicate for disgorgement.

A. *Wrongfulness of Objectors' Conduct*

We base our decision here on long-established principles of equity. It has long been axiomatic "that no person shall profit by his own wrong." *Town of Concord v. Town of Goffstown*, 2 N.H. 263, 265 (1820); see also *Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020) (same); Restatement (Third) of Restitution and Unjust Enrichment § 3 (Am. Law Inst. 2011) (same). The wrong may take any number of forms, of which fraud is perhaps the paradigm. See, e.g., *Liu*, 140 S. Ct. at 1941–42.

A fiduciary's self-dealing is treated as a "constructive" fraud. 1 Joseph Story, *Commentaries on Equity Jurisprudence* 304 (1836). As a general rule, "wherever confidence is reposed, and one party has it in his power, in a secret manner,

for his own advantage, to sacrifice those interests, which he is bound to protect, he shall not be permitted to hold any such advantage." *Id.* at 320; see also, e.g., *Snepp v. United States*, 444 U.S. 507, 515 (1980) (same); Restatement (Third) § 43 (same). We have little difficulty applying these principles to a private payment made to an objector in exchange for withdrawing the appeal of an objection asserting the interests of the class.

### 1. *Young v. Higbee Co.*

Seventy-five years ago, the Supreme Court applied these ancient principles to class litigation in *Young v. Higbee Co.*, 324 U.S. 204 (1945). In that case, Potts and Boag, two preferred shareholders of the bankrupt Higbee Company, objected to confirmation of the company's bankruptcy plan. *Id.* at 206. They argued that the company's preferred shareholders should have been given priority over a junior debt held by Bradley and Murphy, two of the company's directors. *Id.* The district court confirmed the plan over their objection, and Potts and Boag appealed. *Id.* While their appeal was pending, they sold their preferred shares along with the appeal to Bradley and Murphy for seven times the shares' market value. *Id.* at 207. Young, another preferred shareholder, moved in the district court for an accounting of profits from the settlement. *Id.* at 207–08. The motion was denied and Young appealed. *Id.* at 208. The Supreme Court reversed the denial, finding that Potts and Boag's dismissal had been bought at the expense of the class of shareholders they purported to represent. *Id.* at 214.

The Supreme Court based its decision not on formalistic details of procedure but on the substance of the rights Potts

and Boag had asserted—on behalf of all shareholders similarly situated. Potts and Boag argued that because they had appealed as individuals, "they owed no duty to any stockholders but themselves." *Id.* at 209. The Supreme Court disagreed. "Equity looks to the substance and not merely to the form." *Id.* In substance, their appeal had been taken on behalf of all preferred shareholders, whose pro rata shares of the bankruptcy estate would have increased if their appeal had been successful. *Id.* As the only preferred shareholders to appeal confirmation of the plan, Potts and Boag had taken it upon themselves to decide the fate of every preferred shareholder, *id.,* even the fate of the company's entire reorganization. *Id.* at 212 n.12.

The critical step in the Court's reasoning was to recognize that the appellants had taken on a fiduciary duty to the other shareholders similarly situated: "This control of the common rights of all the preferred stockholders imposed on Potts and Boag a duty fairly to represent those common rights." *Id.* at 212. It was a breach of this duty to "trade in the rights of others for their own aggrandizement," as Potts and Boag had done by privately selling their appeal. *Id.* at 213. Their profits from that breach thus belonged in equity to all the preferred shareholders. *Id.* at 214. Finally, the Court concluded, the accounting remedy Young sought was well within the district court's equitable powers. *Id.*

The private settlement of a class-based objection in *Young* is not meaningfully different from the private settlements of class-based objections in this case. As in *Young*, the objections to the *Pearson II* settlement raised by Nunez, Buckley, and Sweeney alleged defects which, if genuine, would have in-

jured every member of the class by binding them all to an un-
fair, unreasonable, or inadequate settlement. Named plain-
tiffs "by definition" had renounced any defense of the class
against such injuries. That's why the three objectors were per-
mitted to take their appeals in the first place. *Devlin v.
Scardelletti*, 536 U.S. 1, 9 (2002). "The situation which enabled
them to traffic in the interests of others was created by a [rule]
passed to protect the interests of all of them." *Young*, 324 U.S.
at 212; see *Devlin*, 536 U.S. at 8–9, citing Fed. R. Civ. P. 23(e).
These objectors were thus "bound to protect" the common in-
terests of the class which the rule at their own behest had en-
trusted to them, but they "sacrifice[d] those interests" to their
own advantage by selling their appeals without benefit to the
class. 1 Story, *supra*, at 320. Equity does not permit them to
keep that gain. *Id.*

As in *Young*, the three objectors' "representative responsi-
bility" to the class in this case was "emphasized" by the fact
that they would have been entitled to seek compensation for
their services if their appeals had succeeded. 324 U.S. at 212–
13; see 1 Story, *supra*, at 450–51, 482–83 (contribution for ben-
efit to common fund) ("one shall not bear the burthen in ease
of the rest"); Restatement (Third) § 29 (same). On the same
principle, named plaintiffs each received $5,000 incentive
awards under the *Pearson II* settlement, and Frank was
awarded $180,000 in attorney fees for the substantial class
benefits he had achieved by objecting to the *Pearson I* settle-
ment. See Fed. R. Civ. P. 23(e)(5)(B) advisory committee's note
("Good-faith objections can assist the court . . . . It is legitimate
for an objector to seek payment for providing such assistance
under Rule 23(h).").

As in *Young*, the objectors here had a duty to object only in "good faith," 324 U.S. at 210–11 & n.9, that is, not for an improper purpose. See *Vollmer v. Publishers Clearing House*, 249 F.3d 698, 709 (7th Cir. 2001) (finding evidence that putative intervenor-objector "was put forward by his attorneys solely to enable them to collect fees in this action"), applying Fed. R. Civ. P. 11(b)(1). Buckley attempts to distinguish *Young* on the basis of this statutory requirement, and more generally as offering no more than a "narrow interpretation" of one section of the bankruptcy laws. The asserted distinction is not genuine and, as noted, *Young*'s reasoning was based not on the details of bankruptcy procedure but on the general equitable principles cited above. It is squarely on point here.

Finally, in one important respect the facts here are even more egregious than in *Young*. There, the Court observed that the purposes of the bankruptcy laws would be flouted if Potts and Boag, by selling out for seven times the market value of their preferred shares, were allowed to receive "$7.00 for every $1.00 paid to other preferred stockholders." 324 U.S. at 210. Even less could the "fair, reasonable, and adequate" settlement demanded by Rule 23(e)(2) be achieved in this case. Sweeney's settlement gave him $96, and Nunez and Buckley $577, for every $1 received by other class members—in exchange for absolutely nothing.[2]

We thus read *Young* to impose a limited representative or fiduciary duty on the class-based objector who, by appealing

---

[2] These estimates assume that every class member would receive $104, the maximum recovery possible under the agreement before adjusting for excess or deficiency of the settlement fund after all claims had been submitted.

the denial of his objection on behalf of the class, temporarily takes "control of the common rights of all" the class members and thereby assumes "a duty fairly to represent those common rights." 324 U.S. at 212.

This case turns on a simple either/or proposition whose logic flows directly from *Young*. These objectors made sweeping claims of general defects in the *Pearson II* settlement. Either those objections had enough merit to stand a genuine chance of improving the entire class's recovery, or they did not. If they did, the objectors sold off that genuine chance, which was the property of the entire class, for their own, strictly private, advantage. If they did not, the objectors' settlements of meritless claims traded only on the strength of the underlying litigation, also the property of the entire class, to leverage defendants' and class counsel's desire to bring it to a close. Either way, the money the objectors received in excess of their interests as class members "was not paid for anything they owned," *id.* at 213, and thus belongs in equity to the class. *Id.* at 214.

The record here indicates that merit was a matter of indifference to these objectors. Compare what they said to what they did. What they said was that the *Pearson II* settlement was either entirely worthless or a collusive reprise of the *Pearson I* settlement. In his objection, Nunez asserted that his counsel had "sole settlement authority" to settle the claims of the *Pearson* subclass he sought to represent in *Nunez*. That would have meant the *Pearson II* settlement was at best unenforceable as to that subclass and at worst void in its entirety. See *Brewer v. Nat'l R.R. Passenger Corp.*, 649 N.E.2d 1331, 1333–34 (Ill. 1995) (settlement unenforceable if negotiated without authority); *Kepple and Co. v. Cardiac, Thoracic and Endovascular*

*Therapies, S.C.*, 920 N.E.2d 1189, 1193 (Ill. App. 2009) (entire contract void if essential term unenforceable). Only a little less sweepingly, Buckley contended that class counsel were being overcompensated at the class's expense to the tune of 13 percentage points of the common fund, or $975,000, in part as a result of billing for hours spent defending the same "selfish deal" we vacated in *Pearson I*. 772 F.3d at 787.

What the objectors did, however, was to advance these superficially plausible objections in the space of four pages each, light on citations to law and fact, and to sell them—before speaking a word in their defense—at discounts from face value ranging from 94 percent (Buckley) to 99.2 percent (Nunez). For his part, Sweeney could not even correctly identify the subject matter of the litigation. The objectors' conduct testifies that, whatever merit their objections might have had, the objectors themselves did not believe them or take them seriously, from the day they were filed to the day they were settled.

### 2. *Nunez's Arguments*

Nunez's arguments against disgorgement are not persuasive. He chiefly argues that his situation is unlike Buckley and Sweeney's because he was settling both his objection to the *Pearson II* settlement and his own *Nunez* action in California. If Nunez were right, he might be entitled to a more precise accounting of his settlement proceeds that reflects the value of any individual claim he might have been asserting. See *Safeco Ins. Co. of America v. AIG, Inc.*, 710 F.3d 754, 757 (7th Cir. 2013) (approving objector side deal where only objector's individual claims were settled), discussed further in *Pearson II*, 893 F.3d at 985–86; compare *Young*, 324 U.S. at 209 ("The appeal here . . . was not from a denial of any individual claim of

Potts and Boag."), 214 (Potts and Boag liable to account only for "money paid in excess of the stock value"). The problem for Nunez is that the value of the *Nunez* action at the time it was settled was zero.

Nunez was himself a member of the *Pearson* class. His opportunity to opt out had already passed when he filed his objection to the *Pearson II* settlement. By settling that objection, Nunez ensured the *Pearson II* settlement would finally bind him just as it bound every other class member. Maintaining *Nunez* thereafter would have been sanctionably frivolous. In any event, after the *Pearson II* settlement, securing dismissal with prejudice of *Nunez* required only that defendants take the basically ministerial steps of pleading accord and satisfaction and moving for judgment on the pleadings. See *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 306–07 (7th Cir. 1986). Nunez's argument that he was leveraging the class's claims to settle his own worthless case for $60,000 impairs rather than improves his position.

Nunez argues further that we have "no jurisdiction" to interfere with his settlement of *Nunez*. It is not clear what kind of jurisdiction he supposes us to lack but the supposition is groundless. Nunez brought these issues before this court in the first instance by filing his objection and appealing its denial. Under Federal Rule of Appellate Procedure 42(b), we had (but regrettably did not exercise) authority to scrutinize Nunez's dismissal of his appeal. See *Pearson II*, 893 F.3d at 987. And the district court had jurisdiction to decide whether that dismissal was part of a "class sellout." *Id.* at 986. If Nunez had wanted to avoid this scrutiny, he might have settled *Nunez* as the entirely separate concern he now insists it was. We have already suggested the likely reason he did not do so: after the

*Pearson II* settlement, the *Nunez* case was a dead letter, so Nunez's only settlement leverage, like Buckley and Sweeney's, was the value of being a nuisance, getting in the way of defendants' and other plaintiffs' desires to put *Pearson* itself to rest.

### 3. *Buckley's Arguments*

Buckley's arguments are also unpersuasive. He argues first that Frank lacks standing to appeal. His theory is that because the district court found "nothing untoward about the objector settlements," Frank cannot "pursue the matter further." This argument confuses standing with the merits. Contra, e.g., *Arreola v. Godinez*, 546 F.3d 788, 794–95 (7th Cir. 2008), among many others. We would have little business as an appellate court if a party's loss in the district court showed lack of standing to appeal.

Buckley does no better to argue Frank never had standing to file his motion in the first place. Frank had standing in the district court and has standing now for the same reason that Buckley and the other objectors had standing in the appeals that precipitated Frank's motion: a class member has standing to defend the class, whose interest he shares, against sell-outs by the self-appointed representatives who control the interests of all. See *Devlin*, 536 U.S. at 6–9; *Young*, 324 U.S. at 212 (without addressing standing); *In re Subway Footlong Sandwich Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) ("as a class member who is bound by the settlement, Frank clearly has standing to appeal"). An equitable remedy for breach of the objectors' limited representative, fiduciary duty is just one instance of the "[m]any traditional remedies," "such as for . . . unjust enrichment," which "are not contingent on a plaintiff's allegation of damages beyond the violation of his private legal

right." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1551 (2016) (Thomas, J., concurring).

Buckley argues further that his fee-only objection would not have increased defendants' liability even if it had been successful. That is correct, and it raises the question: why did defendants pay Buckley to settle his objection? He pleads ignorance, but there is only one reasonable answer: the value to defendants in paying off Buckley lay in finally being rid of the *Pearson* litigation as a whole. And even if class counsel instead of defendants had been the ones to settle with Buckley (on which more in a moment), Buckley's responsibility to the class depended not on whether defendants would have been required to pay more but on whether the class would have been entitled to receive more. See *Young*, 324 U.S. at 212 ("the appeal was taken on the assumption[] that the less the junior claimants were awarded the more all the preferred stockholders would receive"). It would have, as Buckley himself demonstrated by appealing the denial of his objection. See *Pearson I*, 772 F.3d at 786 ("If the class cannot benefit from the reduction in the award of attorneys' fees, then the objector, as a member of the class, would not have standing to object"). That is because the *Pearson II* settlement took class counsel fees out of the common fund, a feature correctly advertised at the time of settlement approval as an improvement over the *Pearson I* settlement. See *id.* (faulting earlier reversion clause providing that "if the judge reduces the amount of fees . . . the savings shall enure not to the class but to the defendant" as "a gimmick for defeating objectors"). Sustaining Buckley's objection would have directly benefited the class.

Buckley argues along parallel lines that defendants independently paid him from their own pockets, without dipping

into the common fund. The district court relied heavily on this contention in denying Frank's motion. It would not alter our analysis if it were true. (In *Young*, neither Potts nor Boag directly picked the pockets of the other preferred shareholders; they held what was not theirs to hold. 324 U.S. at 213–14.) But it is not true as a matter of fact. In the district court, class counsel acknowledged that they had paid $22,500 out of their own fees toward the total of $130,000 paid to settle with the three objectors. Again, under the *Pearson II* settlement these fees were taken from the common fund. Money that class counsel were willing to part with to finally resolve the litigation consisted of savings that ought to have enured to the class—not to defendants, the three objectors, or their lawyers. See *Pearson I*, 772 F.3d at 786.

B. *Remedy*

We now turn to the question of remedy in this case, which poses a practical challenge. Buckley makes the poison-pill argument that rescission of the entire settlement is the only appropriate remedy in this case. That is certainly one remedy Frank might have sought, perhaps if he thought there was real merit to the objections. Buckley provides no support for his claimed right, as the wrongdoer, to force an election under these circumstances. See 2 Story, *supra*, at 506 ("where a trustee, or other person, standing in a fiduciary relation, makes a profit out of any transactions within the scope of his agency or authority, . . . the beneficiary[] . . . has . . . an option to insist upon taking the property; or he may disclaim any title thereto, and proceed upon any other remedies"). So long as Frank did not "insist upon opposite and repugnant rights," *id.* at 507, the choice was his or, more likely, the court's. Rescission of the

entire *Pearson II* settlement also would have punished the wrong parties.

A more intricate question is the proper form of the disgorgement remedy Frank did seek. As the Supreme Court observed in *Liu*, its most recent word on the traditional powers of federal equity courts, the term "disgorgement" is of "relatively recent vintage." 140 S. Ct. at 1940 n.1. It is perhaps best understood not as a freestanding remedy but as the last step in a larger remedial process. See *id.* at 1942–46 (discussing historical variety of settings and labels for orders to disgorge). Like Young's, Frank's motion to discover the objectors' books and to wrest from them whatever settlement proceeds were found there fits most comfortably within the framework of an accounting for profits. See *Young*, 324 U.S. at 214; *Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 706 (S.D. Tex. 2002) ("accounting for profits developed . . . as a restitutionary remedy to avoid unjust enrichment by reaching money owed by a fiduciary . . . , including profits that should in 'equity and good conscience' belong to the plaintiff") (collecting authorities); Restatement (Third) of Restitution and Unjust Enrichment § 51(4).

In theory, the best remedy for the objectors' private appropriation of value that belonged to the class would be to pay those sums into the common fund for direct distribution to all class members. In this case, however, there is a practical problem. The parties appear to agree that distribution of the $130,000 in settlement proceeds to their equitable owners, the class, is no longer possible or would be self-defeating because the administration costs would swallow the benefits. *Liu*

asked but did not answer "what traditional equitable principles govern when . . . the wrongdoer's profits cannot practically be disbursed to the victims." 140 S. Ct. at 1948–49.

This wrinkle, along with the fact that Frank has already discovered specific funds wrongfully held by the objectors, leads us to conclude that the appropriate remedial framework here is the constructive trust. See *Liu*, 140 S. Ct. at 1944; *In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 304–05 (7th Cir. 2014); *Newby*, 188 F. Supp. 2d at 703 ("A constructive trust has long been used as a remedy for unjust enrichment obtained from a fiduciary's breach of duty.") (collecting authorities); Restatement (Third) of Restitution and Unjust Enrichment § 55. If disbursement of objectors' proceeds to the class would produce no benefit to the class, the trust's purpose may instead be accomplished as nearly as possible (*cy pres*) so that it does not fail. See, e.g., *Tauber v. Commonwealth ex rel. Kilgore*, 562 S.E.2d 118, 128 (Va. 2002). As provided for by the *Pearson II* settlement, that would mean ordering payment to the Orthopedic Research and Education Foundation.

Finally, neither objector argues that even if disgorgement were ordered, he would still be entitled to deductions for costs or attorney fees. This is a sound concession. See *Liu*, 140 S. Ct. at 1945–46; *Snepp v. United States*, 444 U.S. 507, 510 (1980) (no deductions) ("Snepp breached a fiduciary obligation and . . . the *proceeds* of his breach are impressed with a constructive trust." (emphasis added)); *Young*, 324 U.S. at 214 (no deductions) ("In the contemplation of the statute which authorized the appeal, its *fruit* properly belongs to all the preferred stockholders." (emphasis added)).

C.  *Consequences for Good-Faith Objectors*

Ours is an adversary system of justice. When defendants and class counsel seek to settle a class action, "the clash of the adversaries" on which our system depends is lost. *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014). The district judge must act as "a fiduciary of the class" in deciding whether to approve a proposed settlement. E.g., *Pearson I*, 772 F.3d at 780. Yet even the most faithful exercise of this duty cannot in itself make up for the absence of adversary presentation. The judge must still rely on the now-allied adversaries "to generate the information that the judge needs to decide the case" faithfully. *Eubank*, 753 F.3d at 720. Genuine adversary presentation is supplied, if at all, only by objecting class members. See *id.*; see also *Devlin*, 536 U.S. at 9 ("once the named parties reach a settlement that is approved over petitioner's objections, petitioner's interests by definition diverge from those of the class representative"). It is therefore critical that class members not be deterred from raising reasonable and good-faith objections to a class settlement. See, e.g., *Pearson I*.

We do not expect reasonable and good-faith objections to be deterred or chilled by our holding here, particularly in light of the 2018 amendments to Federal Rule of Civil Procedure 23 addressing the problem of objector side deals. Rule 23(e)(5)(A) now requires that an objection "state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection." New Rule 23(e)(5)(B)(ii) requires district court approval specifically for "forgoing, dismissing, or abandoning an appeal" of denial in exchange for "payment or other consideration." If the appeal has already been docketed,

under new Rule 23(e)(5)(C) the district court is to issue an indicative ruling under Rule 62.1.

Good-faith objectors should be able to say specifically why the class or a part of it has been deprived of the fair, reasonable, and adequate settlement to which it is entitled. By definition, such objectors expect to be able to improve the class's position, whether by compromise or favorable judgment, for which equitable compensation is available. See Fed. R. Civ. P. 23(e)(5)(B) advisory committee's note ("Good-faith objections can assist the court . . . . It is legitimate for an objector to seek payment for providing such assistance under Rule 23(h)."). We do not expect any good-faith objector will fail to bring her objection because she is prohibited from selling out the class in exchange for private payment, where she may choose instead *not* to sell out the class and still receive payment if she brings the class a real benefit. And we trust no district court will be misled by the facile expedient of dressing a class-based objection in individual clothing to avoid scrutiny under *Young* and our decision here.

### Conclusion

The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion. Circuit Rule 36 shall apply on remand.